# COURT OF APPEALS OF VIRGINIA

**Record No. 0624-25-3**

RANDY JURDEN LARGEN

v.

COMMONWEALTH OF VIRGINIA

Present: Judges Malveaux, Athey and Frucci

Argued at Lexington, Virginia

Opinion Issued May 19, 2026[*]

**FROM THE CIRCUIT COURT OF THE CITY OF MARTINSVILLE**
G. Carter Greer, Judge

Jason S. Eisner for appellant.

Tanner M. Russo, Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

**MEMORANDUM OPINION BY**
**JUDGE CLIFFORD L. ATHEY, JR.**

On February 4, 2025, a jury empaneled in the Circuit Court of the City of Martinsville ("trial court") convicted Randy Jurden Largen ("Largen") of first-degree murder and statutory burglary. On appeal, Largen contends that the trial court erred by 1) refusing to strike two jurors for cause, 2) allowing statements of the decedent to be admitted at trial, 3) refusing to give a jury instruction on manslaughter, and 4) denying his motions to strike the evidence. Finding no error, we affirm.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

# I. BACKGROUND[2]

While police were responding to a 911 hang-up call from an apartment complex, they observed the victim of an assault, C.M.,[3] in a parking lot exhibiting extensive injuries consistent with having received multiple blows. C.M. identified Largen as the individual who had assaulted and battered her, resulting in C.M. succumbing to her injuries nearly two weeks later. Largen was subsequently charged with first-degree murder, in violation of Code § 18.2-32, statutory burglary, in violation of Code § 18.2-91, and felony murder, in violation of Code § 18.2-32.

## A. *The Commonwealth's motion* in limine

The Commonwealth filed a motion *in limine* seeking to admit a recorded statement from the decedent, C.M., in evidence. In support of its pretrial motion *in limine*, the Commonwealth proffered that the evidence to be introduced at trial would prove that around 7:07 a.m. on July 23, 2020, the Martinsville Police Department received two 911 calls from a phone number belonging to C.M. However, both 911 calls had been terminated before the dispatcher could answer either call. The Commonwealth also proffered that at about 7:22 a.m., Officer Cody King ("Officer King") was responding to the apartment complex where the 911 call originated. Officer King was flagged down by C.M. and made contact with her in the parking lot of the

---

[2] "On appeal of challenges to the admissibility of evidence, the sufficiency of the evidence to support a conviction, and constitutional issues, appellate courts view the evidence in the light most favorable to the Commonwealth." *Drexel v. Commonwealth*, 80 Va. App. 720, 731 n.2 (2024). But in reviewing a trial court's ruling on a proposed jury instruction, this Court "view[s] the evidence in the light most favorable" to the proponent of the instruction, which is Largen. *Pena Pinedo v. Commonwealth*, 300 Va. 116, 118 (2021) (quoting *Commonwealth v. Vaughn*, 263 Va. 31, 33 (2002)). "Consequently, this opinion sets out all of the evidence relevant to the issues before the Court." *Drexel*, 80 Va. App. at 731 n.2. Additionally, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

[3] We use initials to protect the privacy of the victim.

- 2 -

Virginia Museum of Natural History. C.M. initially failed to respond when asked what had happened to her; however, after a short pause, C.M. advised law enforcement that "[h]e hit me." She further described how "the guy next door to [her]" broke into her apartment and beat her. The officers noted that C.M. was visibly injured and bleeding while describing what had occurred. The Commonwealth then described and played body-worn camera video that depicted C.M. "trembling, . . . upset, . . . [and] nervous." C.M. then told law enforcement that she thought "he" was going to kill her. Also during the body-worn camera footage, C.M. explained that "he kept knocking real hard" and that "part of [her] door was open, so [she] pushed it back." The video footage also recorded C.M. claiming that Largen was "raging" so she "pushed [her] door to shut it, and he pushed it open." C.M. further claimed that Largen "came back in" the apartment and she "played dead."

Based upon the proffered testimony and video footage, the Commonwealth requested that the trial court rule *in limine* that the hearsay statements of C.M. were admissible in evidence as either an excited utterance or as a dying declaration. Largen contended in response that the hearsay statements of C.M. were not an excited utterance because she "had the presence of mind" to drive nearly a mile from the crime scene before "calm[ly] and concise[ly]" giving "a speech about what happened to her" to the responding officers. Largen also asserted that the admission of C.M.'s hearsay statements would "violate [his] [C]onfrontation [C]lause rights." The trial court subsequently ruled that although the hearsay statements were not admissible as dying declarations, they were admissible as excited utterances. In support, the trial court opined that C.M. was "just spouting off" when talking to the officers and that she was speaking "almost as if the officer was not there." Although the trial court granted the Commonwealth's motion *in limine* to admit the hearsay statements as excited utterances, the trial court limited the admissible

hearsay statements of C.M. to those made by C.M. and recorded during the first minute and ten seconds of the body-worn camera video.

Following the pre-trial ruling, the Commonwealth stated that it would "submit that . . . this is a continued objection," to which Largen's counsel and the trial court agreed. The Commonwealth further stated, "To the extent that I am able to bind my client, the Commonwealth of Virginia, I agree that I am waiving contemporaneous objection to the Rule, to the admission of this evidence." The Commonwealth stated that Largen's counsel "already fairly preserved it" and that Largen's counsel "doesn't need to do it and potentially impact the view of the [j]ury on him or his client by continuing to object." The trial court noted Largen's objection to the ruling, to which Largen's counsel responded, "I guess[] any objection I might make contemporaneously is being handled at this time." The trial court agreed. In its written ruling entered the same day as the hearing, the trial court stated that "[a]fter hearing the evidence and argument of counsel," it "sustained the [m]otion in [l]imine regarding the excited utterance and denied the motion regarding the dying declaration." Neither the trial court's oral nor written rulings mentioned the Confrontation Clause.

B. *Voir Dire*

On the morning of trial, February 4, 2025, Largen's counsel informed the trial court that he had "prepared clothes" for Largen to wear during the trial but Largen "wanted to wear his jail attire." The trial court asked Largen whether he "want[ed] to wear an orange jumpsuit," and Largen stated that "[t]he clothes [are] not an issue." After asking Largen many additional questions concerning his proposed attire during the trial, the trial court stated on the record that Largen "has chosen to wear an orange jumpsuit, and the [c]ourt has no power to force him to wear street clothes." The parties further agreed that the trial court would give the jury "a cautionary instruction" to not draw an adverse inference of guilt based upon Largen's attire. The

- 4 -

trial court indicated that it was "not sure when to do that" but that it would do so "[p]robably as soon as the [j]ury is sworn in."

The jury venire then entered the courtroom and heard the trial court's introductory remarks. The trial court also explained that although Largen was "in an orange jumpsuit," the jury was "not to draw any adverse inference as to [Largen's] charges by his appearance."

During voir dire, the trial court asked the entire jury venire, "Do you know or did you know the alleged victim in the case?" Juror P[4] replied, "I knew her." The trial court then asked how Juror P knew C.M. Juror P advised the trial court that C.M. was "[a] friend of the family" that she would see "[a]t family events" such as "Thanksgiving, Christmas, [or] things like that." The trial court then asked Juror P, "Would the fact that you knew [C.M.] and that she was a friend of your family, and you saw her at family events, would those facts in any way impair your ability to serve as a fair and impartial juror in this case?" Juror P responded "No" to questions from the trial court on whether her relationship with the victim would "impair [her] ability to serve as a fair and impartial juror" and whether it would "have any bearing on [her] decision."

The trial court subsequently asked the jury venire if anyone "ha[d] any opinion as to [Largen's] guilt or innocence?" No affirmative responses to the trial court's question appear in the record. The trial court next asked the jury venire if any juror had "acquired any information about this case from any source whatsoever?" Juror P responded affirmatively that she had acquired information from the "[n]ewspaper and family." The trial court then asked Juror P individually if "the fact that you have read about this case in the paper and that you have discussed those facts that you read with other family members" would "impair your ability to serve as a fair and impartial juror in this case?" Juror P replied, "No." When the trial court

---

[4] We use initials to protect the privacy of the members of the venire.

further asked Juror P if she could "put aside what you've read and base your decision solely on the law and the evidence that you hear today," she responded, "Yes," and further agreed with the trial court that what she had read "[would] have no bearing whatsoever" on her decision.

Juror G then interrupted the trial court by stating that he had "a preconceived verdict" about the case based on Largen appearing with "chains on and the orange jumpsuit." Juror G stated that this made him believe that Largen had "done did something bad" and that "the presence of officers all around the courtroom" caused Juror G to think that Largen "done did something really, really bad." Although Juror G referenced the trial court's admonition that Largen was innocent as "swaying" him, Juror G still noted that every time he looked at Largen and saw "the orange jumpsuit," he was "preconceived." Juror G then affirmed to the trial court that he could not "make a fair decision" regarding Largen's case and was "looking at it like [Largen] [was] already guilty."

The trial court then asked if there was "anyone else who feels that way" in the jury venire, and Juror S stated that she had "never been in a courtroom" with "this many police officers surrounding the public." The trial court and Juror S then had the following exchange:

> [Trial court]: Well, you realize some of these police officers are witnesses?
>
> [Juror S]: I realize that, but not the ones standing up.
>
> [Trial court]: We do have a lot of security here.
>
> [Juror S]: I realize that, and I appreciate that, but it does make me feel a little uneasy.
>
> [Trial court]: There's a reason for that.
>
> [Juror S]: I understand.
>
> [Trial court]: With this type of case and these types of charges. Back to you, [Juror G], and I guess [Juror S]. [Juror S], you're telling me you feel the same way as [Juror G]?

- 6 -

[Juror S]: Yes sir.

[Trial court]: What he said?

[Juror S]: Yes sir.

[Trial court]: Alright. Let me just make sure here. And there's nothing that you want to add to what [Juror G] said?

[Juror S]: No sir, but I'm just going to tell you, I mean I can serve on a [j]ury, but everything that he said, I totally agree with, but I can't tell you that I'm sitting here feeling easy.

The trial court then asked Juror G if he would "be able to abide by" the trial court's limiting instruction regarding Largen's attire. Juror G advised the trial court that he could not do so because he was "looking at [Largen] now saying that he's guilty." The trial court noted that Juror G's responses "require[d]" that he be excused from service on the jury.

The trial court then asked Juror S whether she would be able to abide by the trial court's limiting instruction regarding Largen's attire. Juror S responded, "I mean I feel like I can serve on the [j]ury, but I'm going to tell you, I'm very uneasy." The trial court stated that "uneasiness is just a fact of life" and "not necessarily something that would exclude" Juror S from serving on the jury. The trial court further noted that "[t]here's a certain amount of uneasiness in trying this type of case" but stated that the trial court's question was "more pointed than that." The trial court then asked again if Juror S could follow the trial court's instruction regarding Largen's attire. In response, Juror S agreed that she "would not draw any adverse inference" from Largen's orange jumpsuit. The trial court later asked the jury venire if they understood that Largen was presumed innocent until proven guilty beyond a reasonable doubt, to which all veniremen agreed that they understood the principle. All members of the jury venire also agreed that they did not "know of any reason whatsoever" why they could not give a fair trial to Largen and the Commonwealth.

During voir dire conducted by Largen's counsel, Juror P responded that she did still "associate" with the victim's family but that she found out about the victim's death through the newspaper. Juror P further elaborated that she saw the victim's family "a couple of weeks" after the victim's death and agreed that she discussed the death with them. Juror P added that she had seen the victim's family "[m]aybe five [or] six times" since then and that the victim's death did not "come up again after that first time." Largen's counsel did not ask any additional voir dire questions of Juror S.

Following the completion of voir dire, Largen moved to strike Juror P and Juror S from the jury venire for cause. In support of striking Juror P for cause, Largen contended that her familiarity and continued association with the victim's family rendered her "unable to sit impartially in this case." Largen further noted that Juror P had discussed the issue with the victim's family and some information that had been discussed with the victim's family might "com[e] out during deliberations." Largen also asserted that the information Juror P received from the media would render her unable to sit on the jury as well. The Commonwealth responded that Juror P had "never once waivered from the assurance that she can be a fair juror, that she can set all this aside." The Commonwealth further contended that Juror P had agreed to follow all the trial court's instructions regarding any outside information that Juror P might have acquired from C.M.'s family members or the media. The trial court then denied the motion to strike Juror P for cause, stating that "[e]very time [Juror P] was asked a question, she said that it would have no effect on her ability to serve."

Largen also moved to strike Juror S for cause, asserting that "her statements . . . on [Largen's] appearance in his jail attire" and the large amount of courtroom security "made it clear that that's going to affect her decision." Largen further contended that although Juror S said that she would be fair, the statement could not be taken "at face value." Largen also asserted

that Juror S made "a specific statement . . . saying that she [was] going to consider improper factors," although "she wasn't as explicit as [Juror G]" in her response. The Commonwealth responded that Juror S "deserves some credit for her candor" and that Juror S "said she could be fair." The Commonwealth further noted that the trial court had "asked the very appropriate clarifying question, 'Are you able to be fair and follow the [trial] [c]ourt's [i]instruction?' and she said she could do it." The trial court also denied the motion to strike Juror S for cause, noting that she had initially "said she felt the same way as [Juror G], but she differed from [Juror G] in that she said she would obey the [trial] [c]ourt's [i]instruction." Largen used two of his preemptory strikes to remove Juror P and Juror S from the jury venire. Following exhaustion of the parties' peremptory strikes, the trial court swore in the petit jury and the parties gave their opening statements.

C. *Evidence Presented at Trial*

Following opening statements, the Commonwealth called C.M.'s daughter, Tiwianna Hairston ("Hairston"), as the first witness. She testified that in 2020, her mother lived alone in an apartment in Martinsville. She further testified that on the day that her mother was attacked, Hairston went to visit her in the hospital and saw "bruises galore" all over her body. Hairston also testified that the bruises she saw were on both of her mother's forearms, her mouth, and her nose. Hairston also confirmed that her mother was 68 years old when she died in the hospital from the injuries she sustained as a result of the attack.

The Commonwealth then called Officer King, who testified that on July 23, 2020, the police dispatcher reported that there had been a 911 hangup call at 7:04 a.m.[5] Officer King

---

[5] Officer King was presented with a "Dispatch Call Sheet" that catalogued the 911 hangup call as occurring at 7:04 a.m. Although the motion *in limine* proffer stated that there were two calls occurring at around 7:07 a.m., Officer King was only asked about a single phone call, not two, and the record does not account for the difference between the motion *in limine*

testified that he and another officer responded to the area of Rives Road, where the 911 hangup call had originated. While in transit, Officer King recalled that C.M. flagged the officers down and asked them for their assistance. Portions of the other responding officer's body-worn camera, which captured C.M.'s statements noted above, were admitted in evidence and published to the jury. Officer King also testified that after emergency services arrived and transported C.M. to the hospital for treatment for her injuries, he traveled to C.M.'s apartment located at 900 Rives Road, Apartment 101-D. Following the arrival of additional law enforcement, they were provided access to C.M.'s apartment by the property manager. Officer King recalled that they observed "pieces of wood sticking out" around the doorknob of the front door to C.M.'s apartment. Officer King then testified that after opening the apartment door, he observed the apartment interior, which had "[s]tuff . . . laying kind of everywhere" and items that "looked out of place."

Officer King then explained to the jury that the property manager gave the officers the key to Apartment 102-D, which was located "right beside" C.M.'s. Officer King then advised the jury that Apartment 102-D was Largen's apartment and that Largen was present in the apartment when they arrived. Officer King recalled that they called out to Largen, who emerged from the apartment wearing flip-flops before being detained. Officer King described Largen as "loud" and "very agitated" during his detention. Officer King also testified that he subsequently seized the left flip-flop because it "had a red stain on it." Officer King also testified that Largen told him that he had been "doing laundry." The Commonwealth then admitted in evidence photos of Largen and C.M. taken on the date of the incident.

proffered evidence and Officer King's testimony at trial. For purposes of evaluating Largen's assignments of error, we use the time established at trial, 7:04 a.m.

Gregory Lieteau ("Lieteau") then testified that he was C.M.'s neighbor at the Martinsville Lofts apartments. He testified that he lived in Apartment 103-D and that "Mr. DeShazo," who was deaf, lived in the fourth and remaining apartment, 104-D, located in that building. Lieteau further testified that accessing the four apartments required opening a locked door before accessing a common hallway. He also testified that the doors were "always" locked and closed automatically. Lieteau also testified that on the morning of the attack, he heard "a lady screaming . . . 'stop, stop, stop,'" as well as "stomping and beating." Lieteau described the voice as "crying," "yelling," and "asking for help."

The Commonwealth then called Angela Haley ("Haley"), who testified that she was the property manager at the Martinsville Lofts apartment complex. She explained that the four apartments in the "D building" could only be accessed by someone that had a key to that building. She also confirmed that C.M. lived in Apartment 101, Largen lived in Apartment 102, Lieteau lived in Apartment 103, and that the "older gentleman" who lived in Apartment 104 was elderly and had "some difficulty walking." She also confirmed that law enforcement officers contacted her on July 23, 2020, and that she provided them access to Largen's apartment.

The Commonwealth next called Captain Benjamin Peters ("Captain Peters") of the Martinsville Police Department. He testified that on July 23, 2020, he responded to C.M.'s apartment and observed a "rug with a red stain that appeared to be blood," as well as "items laid [on] the floor that looked out of place." Captain Peters also testified that he observed "the latch to the door . . . laying [on] the floor just inside the doorway." After confirming that there was no one else in the apartment, Captain Peters testified that he and other officers moved to Largen's apartment, where he heard Largen talking inside. Captain Peters recalled that after knocking on the apartment door and announcing that they were law enforcement officers, they used the key they obtained from Haley and opened Largen's apartment door. Captain Peters testified that he

then observed Largen standing inside the apartment and asked him to exit his apartment, which he did. Captain Peters explained to the jury that while he was detaining Largen, he noticed that Largen's hair was wet. He also recalled a strong "cleaning bleach smell" in the "public shared laundry room." Captain Peters was also able to identify clothing "in the bottom of the washer" that had recently been washed.[6]

The Commonwealth then called Officer R.L. Ratcliffe ("Officer Ratcliffe") of the Martinsville Police Department. Officer Ratcliffe testified that following his arrival at the apartment complex, he was tasked with collecting evidence from the crime scene. He testified that he collected residue from what appeared to be a blood stain in C.M.'s apartment and additional residue from what appeared to be a blood stain in Largen's apartment. He also collected evidence from two additional blood stains present in the hallway of Building D. He explained to the jury that he packaged in an evidence bag the four separate stains, as well as an orange "Solo" brand cup from the hallway. He then gave the items of evidence to Investigator Joe Washburn ("Investigator Washburn") of the Henry County Sheriff's Department, formerly of the Martinsville Police Department. Officer Ratcliffe also testified that while viewing pictures of the stain taken from C.M.'s apartment, he was able to make out a "tread wear pattern."

The Commonwealth next called Investigator Washburn, who confirmed that he collected the items of clothing in the community laundry room that had been washed with bleach, which included one shirt and one pair of pants. He also testified that he accepted custody from Officer Ratcliffe of the bloodstain evidence. Washburn then testified that he took DNA swabs from C.M. and Largen for comparison purposes. Washburn explained to the jury that he personally

---

[6] The Commonwealth also called Officer Trishia Elgin of the Martinsville Police Department, who testified that she kept a log of the crime scene and ensured that no civilians entered into either apartment.

transported all the items of evidence to be analyzed to the Virginia Department of Forensic Science ("DFS") for DNA comparison testing.

The Commonwealth then called Dr. Eli Goodman ("Dr. Goodman"), who testified that he worked as a forensic pathologist for the Office of the Chief Medical Examiner in the Western District Office. He testified that he performed C.M.'s autopsy and observed signs of medical treatment to her body, including surgical interventions involving her eye and chest. He noted that C.M. had contusions to her head and neck, swelling of her right eye, hemorrhaging underneath the skin of her neck and muscles, and hemorrhaging in her brain. He also testified that C.M. suffered from fractures of both of her eye sockets. Dr. Goodman further testified that C.M. had bruising on her upper chest, abdomen, and near her groin, and had blood in her chest cavity and bruising and bleeding "associated with her left lung." He also confirmed that she had bruising on her arms and legs. Dr. Goodman then opined that the injuries he viewed were consistent with "more than one impact point" of injury, in "the multiples of tens," and concluded that the cause of death was "blunt force trauma of the head, neck, torso, and extremities." Dr. Goodman agreed that there was nothing in C.M.'s medical history and records that "would suggest an intervening cause of death."

Dr. Goodman also testified that C.M. had several naturally occurring health problems, including problems with her head and kidneys. Dr. Goodman noted that C.M. experienced a "pretty extensive surgical procedure" while receiving treatment for her fatal injuries. He also testified that C.M. had "Behcet's syndrome," which is a "disease that causes inflammation in the blood vessels" and could "cause blood clots." But Dr. Goodman clarified that none of the pre-existing conditions from which C.M. suffered were "independently fatal," although he acknowledged that the conditions may have made her ability to recover from her injuries more difficult. Dr. Goodman further opined that none of the pre-existing conditions from which C.M.

- 13 -

suffered would "impact" his opinion regarding the cause of C.M.'s death. In addition, he provided further detail concerning the surgical procedure performed on C.M. in the hospital, noting that "the reason for [her] injuries were that she was assaulted in the first place." He also reiterated that the injuries "were due to blunt force trauma from the assault" and were not "naturally occurring." He also testified that the injuries to C.M.'s arms and forearms were "consistent with defensive injuries."

The Commonwealth next called Kathleen Holznagel ("Holznagel"), a senior forensic scientist employed by DFS who had performed DNA testing on the various blood stains. She testified that C.M.'s DNA was found in the blood stain from Largen's apartment. She also testified that she found Largen's blood and saliva in the orange "Solo" cup that was recovered from the hallway and that C.M.'s DNA was also found in the blood stain from the hallway. She further testified that C.M.'s DNA was also found in the blood on the bottom of Largen's flip-flop. After briefly recalling Investigator Washburn to identify Largen, the Commonwealth rested.

D. *Motions to Strike*

The jury recessed and outside of their presence, Largen moved to strike the charges against him. In support of his motion to strike, Largen contended that the injuries to C.M. failed to prove either that he intended to kill C.M. or that Largen acted with premeditation, since C.M. "was not dead immediately following th[e] encounter." He also asserted that there was insufficient proof of malice because Largen also had blood "spilled" during the incident, which would negate any "inference" of malice. He further argued that Largen's identity as the perpetrator had not been sufficiently proven. He also asserted that based on C.M.'s statement to the officers, C.M. opened the door for Largen and closed it when Largen opened it again. Hence,

- 14 -

counsel for Largen contended that C.M.'s statement did not establish that Largen's alleged actions rose to the level of breaking and entering.

In response, the Commonwealth contended that the size difference between Largen and C.M., as established by photographs in the record, demonstrated that Largen was much larger than C.M., and a factfinder could therefore infer that Largen intended to kill C.M. because of the number of blows inflicted. The Commonwealth also claimed that the statutory burglary charge should go to the jury because the latch to the door was on the floor of the apartment when officers entered and the door had extensive damage around the doorknob. The trial court subsequently denied the motion to strike and reconvened the jury. Largen elected not to present any evidence in his defense and outside of the presence of the jury renewed his motion to strike, which the trial court again denied.

E. *Jury Instructions*

Largen submitted three instructions regarding manslaughter.[7] Largen claimed that there was at least a scintilla of evidence to support his manslaughter instructions based on Largen's

---

[7] Instruction A stated, in relevant part:

> The defendant is charged with the crime of voluntary manslaughter. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
> (1) That the defendant killed [C.M.]; and
> (2) That the killing was the result of an intentional act; and
> (3) That the killing was committed while in the sudden heat of passion upon reasonable provocation or in mutual combat.

Instruction B stated:

> THE COURT INSTRUCTS THE JURY THAT once the Commonwealth has proved there was an unlawful killing, then you may, but are not required, to infer that there was malice and that the act was murder in the second degree unless, from all the evidence, you have a reasonable doubt as to whether malice existed[.]

blood being present at the scene and for that reason one of the manslaughter instructions should be given to the jury. The trial court declined to grant Largen's proposed instructions, finding that "there [was] no evidence of mutual combat[,] . . . heat of passion, . . . [or] legally sufficient provocation."

The trial court then instructed the jury, after which the Commonwealth and Largen presented their closing arguments. After retiring to deliberate, the jury returned with a verdict convicting Largen on all charges.[8] Largen elected to be sentenced by the jury. The jury returned a recommendation of a life sentence on the first-degree murder charge and 20 years of incarceration on the statutory burglary charge, which the trial court adopted. Largen appealed.

## II. ANALYSIS

### A. *Standard of Review*

"The striking of any individual potential juror for cause . . . is committed to the sound discretion of the trial court." *Townsend v. Commonwealth*, 270 Va. 325, 329 (2005). "As an appellate court, we must defer to a trial court's ruling on the issue of whether to retain or excuse a prospective juror for cause and that ruling will not be disturbed on appeal unless there has been manifest error amounting to an abuse of discretion." *Barrett v. Commonwealth*, 262 Va. 823, 826 (2001). "Decisions regarding the admissibility of evidence 'lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion.'" *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019) (quoting *Michels v. Commonwealth*, 47 Va. App.

---

Instruction C stated:

> THE COURT INSTRUCTS THE JURY THAT the difference between murder and manslaughter is malice. When malice is present, the killing is murder. When it is absent, the killing can be no more than manslaughter[.]

[8] The Commonwealth agreed to dismiss the felony murder conviction as violative of the Fifth Amendment's Double Jeopardy Clause.

461, 465 (2006)).  Findings of fact by the trial court are binding on this Court in our review

unless they are "'plainly wrong' or without evidence to support them."  *Campos v.

Commonwealth*, 67 Va. App. 690, 702 (2017) (quoting *McGee v. Commonwealth*, 25 Va. App.

193, 198 (1997) (en banc)).  "When evidence is challenged on Confrontation Clause grounds, we

review the alleged violation of constitutional rights de novo."  *Cruz v. Commonwealth*, 84

Va. App. 703, 718-19 (2025).

Our "responsibility in reviewing jury instructions is 'to see that the law has been clearly

stated and that the instructions cover all issues which the evidence fairly raises.'"  *Conley v.

Commonwealth*, 74 Va. App. 658, 674-75 (2022) (quoting *Fahringer v. Commonwealth*, 70

Va. App. 208, 211 (2019)).  "We review a trial court's decisions in giving and denying requested

jury instructions for abuse of discretion."  *Id*. at 675.  "[W]hether a jury instruction accurately

states the relevant law is a question of law that we review de novo."  *Watson v. Commonwealth*,

298 Va. 197, 207 (2019) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)).  "And in

deciding whether a particular instruction is appropriate, we view the facts in the light most

favorable to the proponent of the instruction."  *Holmes v. Commonwealth*, 76 Va. App. 34, 53

(2022) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)).

"An abuse of discretion occurs 'when a relevant factor that should have been given

significant weight is not considered' or 'when an irrelevant or improper factor is considered and

given significant weight.'"  *Diaz v. Commonwealth*, 80 Va. App. 286, 304 (2024) (quoting

*Landrum v. Chippenham & Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011)).  "In

evaluating whether a trial court abused its discretion, . . . '[this Court does] not substitute [its]

judgment for that of the trial court.  Rather, [this Court] consider[s] only whether the record

fairly supports the trial court's action.'"  *Id.* at 304-05 (alterations in original) (quoting *Carter v.

Commonwealth*, 293 Va. 537, 543 (2017)).  "Only when reasonable jurists could not differ can

we say an abuse of discretion has occurred." *Id.* at 305 (quoting *Lambert v. Commonwealth*, 70 Va. App. 740, 749 (2019)).

"Reviewing a challenge to the sufficiency of the evidence to support a conviction, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Melick v. Commonwealth*, 69 Va. App. 122, 144 (2018) (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (en banc)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Burrous v. Commonwealth*, 68 Va. App. 275, 279 (2017)). "In conducting our analysis, we are mindful that 'determining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify.'" *Id.* (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)). "Thus, we will affirm the judgment of the trial court unless that judgment is 'plainly wrong or without evidence to support it.'" *Id.* (quoting *Kelly*, 41 Va. App. at 257).

B. *The trial court did not err in refusing to strike Jurors P and S for cause.*

Largen contends that the trial court erred by not striking Juror P or Juror S for cause because "[Juror P] knew the decedent and her family and had discussed the incident with them" and "[Juror S] openly stated that she would consider impermissible factors in reaching a verdict, thereby indicating that neither juror could stand indifferent in the cause." We disagree.

"In Virginia, a defendant in a criminal case 'is entitled to a panel of jurors free from exception before exercising peremptory challenges.'" *DeLeon v. Commonwealth*, 38 Va. App. 409, 412 (2002) (quoting *Cressell v. Commonwealth*, 32 Va. App. 744, 755 (2000)). "If a

prospective juror 'does not stand indifferent to the cause, he is not competent. If he has any interest in the cause, . . . or has expressed or formed any opinion, or is sensible of any bias or prejudice, he is excluded by the law.'" *Lovos-Rivas v. Commonwealth*, 58 Va. App. 55, 60-61 (2011) (quoting *Spangler v. Ashwell*, 116 Va. 992, 996-97 (1914)). "The opinion entertained by a juror, which disqualifies him, is an opinion of that fixed character which repels the presumption of innocence in a criminal case, and in whose mind the accused stands condemned already." *Justus v. Commonwealth*, 220 Va. 971, 976 (1980). "[A]ny reasonable doubt as to a juror's qualifications must be resolved in favor of the accused." *Breeden v. Commonwealth*, 217 Va. 297, 298 (1976). "In conducting our review, we consider the juror's entire *voir dire*, not merely isolated statements." *DeLeon*, 38 Va. App. at 413 (quoting *Lovitt v. Commonwealth*, 260 Va. 497, 510 (2000)).

Here, Juror P indicated that she was a "friend of the family" and knew the victim. But when asked by the trial court if that would "impair [her] ability to serve as a fair and impartial juror," Juror P answered in the negative and confirmed that it would "have no bearing on [her] decision" in the case. Additionally, Juror P indicated that she had acquired information about the case from local media and from "family," but she also indicated that it would not affect her ability to be impartial in the case. She also confirmed that her decision in the case would be solely based on the law and evidence. Accordingly, when viewing the entirety of Juror P's voir dire and giving due deference to the trial court, we hold that the trial court did not abuse its discretion in denying Largen's motion to strike her for cause. *See Huguely v. Commonwealth*, 63 Va. App. 92, 121-22 (2014) (affirming the trial court's denial of a strike for cause where a prospective juror said that she "felt that [appellant] was guilty based on conversations with others and . . . media reports" but ultimately "denied having formed an opinion as to [appellant's] guilt or innocence and explained that she could make a decision based on the facts"). The record does

not demonstrate that the information that Juror P acquired would have affected her ability to serve as a fair and impartial juror in the case.

Likewise, the trial court did not err in denying Largen's motion to strike Juror S for cause. The trial court asked the entire venire if anyone "ha[d] any opinion as to [Largen's] guilt or innocence," and no juror agreed. Juror S stated that she initially was feeling "the same way as [Juror G]" and said that "everything that he said, [she] totally agreed with." But in contrast with Juror G, who admitted that he was "looking at [Largen] now saying that he's guilty," Juror S instead responded to the trial court that although she was "very uneasy" because of the police presence in the room and Largen's charges, she felt like she could serve on the jury. And most significantly, the trial court confirmed that Juror S "would not draw any adverse inference" from Largen's orange jumpsuit. Juror S also stated that she would follow the trial court's instruction, demonstrating that her initial opinion of Largen was not of a "fixed character." *Justus*, 220 Va. at 976. Accordingly, looking to the entirety of the voir dire conducted by the trial court, we find no error in the trial court's denial of Largen's motions to strike Juror P and Juror S for cause.

C. *The trial court did not err in admitting statements of the decedent*.

Largen asserts that the trial court erred in admitting "extrajudicial statements of the decedent" in violation of the rules against hearsay and his "constitutional right of cross examination." We disagree.

"As a general rule, hearsay evidence is incompetent and inadmissible, and '[t]he party seeking to rely upon an exception to the hearsay rule has the burden of establishing admissibility.'" *Esser v. Commonwealth*, 38 Va. App. 520, 525 (2002) (alteration in original) (quoting *Neal v. Commonwealth*, 15 Va. App. 416, 421 (1992)); *see* Va. R. Evid. 2:802. But an excited utterance is "not excluded by the hearsay rule." Va. R. Evid. 2:803. An excited utterance is "[a] spontaneous or impulsive statement prompted by a startling event or condition and made

by a declarant with firsthand knowledge at a time and under circumstances negating deliberation." Va. R. Evid. 2:803(2). "There is no fixed rule by which the question whether the statement is admissible as an excited utterance can be decided." *Caison v. Commonwealth*, 52 Va. App. 423, 431 (2008) (quoting *Clark v. Commonwealth*, 235 Va. 287, 292 (1988)).

"Although not controlling, the lapse of time between the 'startling event' and a declaration offered in evidence is relevant to a determination whether the declaration was spontaneous and instinctive, or premeditated and deliberative." *Synan v. Commonwealth*, 67 Va. App. 173, 184 (2017) (quoting *Doe v. Thomas*, 227 Va. 466, 471 (1984)). "The test is whether the statement is the transaction speaking through the declarant or the declarant speaking about the transaction." *Clark*, 235 Va. at 292. "A homicide victim's statement 'made a short time after he has been mortally wounded which obviously [has] not been concocted or premeditated charging the defendant with the act' is admissible as an excited utterance." *Id.* (alteration in original) (quoting *Huffman v. Commonwealth*, 168 Va. 668, 681 (1937)). The issue "depends [upon] the circumstances of each case." *Caison*, 52 Va. App. at 431 (alteration in original) (quoting *Clark*, 235 Va. at 292).

Here, the circumstances of this case, when viewed in totality, support the trial court's exercise of its discretion to admit C.M.'s statements. The 911 hang-up call was received at 7:04 a.m. and officers spoke with C.M. approximately 15 to 20 minutes later. At the time that C.M. spoke with officers, she had left her apartment and traveled into a public parking lot. The body-worn camera video demonstrated that C.M. had visible injuries and was bleeding. She told officers that "the guy next door to [her]" broke into her apartment and beat her and told officers that she thought "he" was going to kill her. Rather than responding to the officer's questions about what happened to her, the trial court found that C.M. was "spouting off," not answering the officer's questions, and was speaking "almost as if the officer was not there." Thus, Largen's

attack on C.M. supplied the "startling event," C.M.'s statements were "spontaneous or impulsive," and the totality of the circumstances "negat[es] deliberation." Va. R. Evid. 2:803(2).

Furthermore, the fact that C.M.'s statements were made in response to the officer's question of "what happened" is not dispositive of our inquiry either. *See Hicks v. Commonwealth*, 60 Va. App. 237, 247-48 (2012) (holding that "[t]he fact that [the declarant's] statements followed [the] general question of 'What happened?' . . . d[id] not diminish the fact that his statements were made under the impulse of a startling event"); *Caison*, 52 Va. App. at 433 ("[T]he fact that [the declarant] was answering questions, rather than relaying a spontaneous narrative, does not indicate her statements were not excited utterances.") The trial court's finding of fact that C.M. conveyed what happened to her "almost as if the officer was not there" is not plainly wrong and demonstrates that C.M.'s statements were "the transaction speaking through the declarant," thus not making C.M.'s statements responsive to any questions by the officers. *Clark*, 235 Va. at 292. Accordingly, the trial court did not err in admitting C.M.'s statements to the officers from July 23, 2020.

Additionally, assuming without deciding that Largen has preserved his objection regarding the Confrontation Clause, we find that the trial court likewise did not err in admitting C.M.'s statements to Officer King in evidence.[9]

---

[9] During the pre-trial hearing on the Commonwealth's motion *in limine*, Largen briefly referenced the Confrontation Clause, but the record does not affirmatively demonstrate that the trial court ruled on this aspect of Largen's opposition to the motion. Ordinarily, this possible failure of the trial court to rule on Largen's argument could otherwise preclude our review of this aspect of his argument. *See* Rule 5A:18. But the Commonwealth also expressly waived any argument as to the preservation of the issue and stipulated that the objection would be "continuing." Hence, we assume without deciding that we can reach the merits of Largen's argument. *See McGinnis v. Commonwealth*, 296 Va. 489, 501 (2018) ("[I]n cases where the ability of the Court to review an issue on appeal is in doubt, we may 'assume without deciding' that the issue can be reviewed provided that this permits us to resolve the appeal on the best and narrowest grounds.")

The Confrontation Clause of the Sixth Amendment "guarantees that a criminal defendant will have the opportunity 'to be confronted with the witnesses against him.'" *Cody v. Commonwealth*, 68 Va. App. 638, 657 (2018) (quoting U.S. Const. amend. VI). But "the Confrontation Clause applies only to 'testimonial' statements." *Id.* In determining whether a statement is testimonial or not, we look to whether the statement was made with the primary purpose of creating "a substitute for trial testimony." *Canada v. Commonwealth*, 75 Va. App. 367, 385 (2022). "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822 (2006). "[C]ourts should consider the totality of the circumstances when determining whether out-of-court statements are nontestimonial." *Canada*, 75 Va. App. at 383.

Here, police responded to a 911 call and were flagged down by C.M. C.M. appeared to the officers to be injured and upset, with blood, bruising, and other injuries on her body. Rather than deliberately respond to investigative questions, C.M. elected to speak in a non-responsive monologue that did not directly respond to the officer's inquiries. The Commonwealth only introduced about a minute of the interview, in which C.M. appears upset and disoriented throughout. C.M. expressed concern for her safety to the officers, as Largen was still at large at this point and she believed he was trying to kill her. Thus, the "circumstances objectively indicat[e] that the primary purpose of the interrogation [was] to enable police assistance to meet an ongoing emergency." *Davis*, 547 U.S. at 822. Accordingly, assuming without deciding that Largen preserved this argument in the trial court, we find no error in the trial court admitting C.M.'s declarations at trial.

- 23 -

D. *The trial court did not err in refusing jury instructions regarding manslaughter.*

Largen asserts that the trial court erred by not giving an instruction regarding manslaughter because there was "more than a scintilla of evidence of mutual combat or heat of passion" because his "blood had also been spilled in the incident." We disagree.

"A litigant is entitled to jury instructions supporting his or her theory of the case if sufficient evidence is introduced to support that theory and if the instructions correctly state the law." *Schlimmer v. Poverty Hunt Club*, 268 Va. 74, 78 (2004). "The purpose of jury instructions 'is to fully and fairly inform the jury as to the law of the case applicable to the particular facts, and not to confuse them.'" *Honsinger v. Egan*, 266 Va. 269, 274 (2003) (quoting *H.W. Miller Trucking Co. v. Flood*, 203 Va. 934, 936 (1962)). The evidence presented in support of an instruction "must amount to more than a scintilla." *Justus v. Commonwealth*, 222 Va. 667, 678 (1981).

"Voluntary manslaughter is the unlawful killing of another, 'committed in the course of a sudden quarrel, or mutual combat, or upon a sudden provocation, and without any previous grudge, and the killing is from the sudden heat of passion growing solely out of the quarrel, or combat, or provocation.'" *Woods v. Commonwealth*, 66 Va. App. 123, 131 (2016) (quoting *Wilkins v. Commonwealth*, 176 Va. 580, 583 (1940)). "Heat of passion refers to the furor brevis which renders a man deaf to the voice of reason." *Id.* (quoting *Rhodes v. Commonwealth*, 41 Va. App. 195, 200 (2003)). "Heat of passion is determined by the nature and degree of the provocation and may be founded upon rage, fear, or a combination of both." *Barrett v. Commonwealth*, 231 Va. 102, 106 (1986). "For combat to be 'mutual,' it must have been voluntarily and mutually entered into by both or all parties to the affray." *Lynn v. Commonwealth*, 27 Va. App. 336, 356 (1998).

Here, Largen asserts that the bare presence of his blood at the scene of C.M.'s death necessarily means there is a scintilla of evidence that Largen either entered into mutual combat with C.M. or acted in the heat of passion. The record belies this contention. Even when viewing the evidence in Largen's favor as the proponent of the instructions, there is "no evidence of purported objective facts, or even inferences from purported objective facts" that support Largen's theory of the case. *Commonwealth v. Kartozia*, 304 Va. 321, 333 (2025) (holding that appellant's belief that he had "some legal right to remain on the premises" was not sufficient evidence of appellant's "claim of right" defense to trespassing). The record does not contain any statements, actions, or provocations by C.M. that would lend any support to Largen's theory that the two engaged in mutual combat, or that C.M.'s words or actions gave rise to Largen acting in such "rage" or "fear" as to warrant an instruction on voluntary manslaughter. *Barrett*, 231 Va. at 106; *see Jones v. Commonwealth*, 71 Va. App. 70, 96 (2019) (holding that appellant's testimony that "he acted out of fear" was insufficient to show heat of passion where the murder victim had "reached toward his waistband and threatened" appellant). Thus, the only evidence in the record that Largen relies on is the presence of his blood at the scene. But Largen does not cite to any case—and we cannot locate one—where the mere presence of a defendant's blood at the scene of a homicide is, standing alone, a scintilla of evidence that warrants granting a jury instruction regarding voluntary manslaughter. *See Lewis v. Commonwealth*, No. 0219-24-1, slip. op. at 30 (Va. Ct. App. July 22, 2025)[10] (holding that the trial court did not err in denying appellant's jury instruction on voluntary manslaughter where appellant argued "there was no direct evidence of what occurred" on the day of the murder and therefore "the jury could have reasonably believed

___

[10] We rely on unpublished cases for their informative and persuasive value. Rule 5A:1(f); *see Osman v. Commonwealth*, 76 Va. App. 613, 653 n.23 (2023).

- 25 -

that the alleged killing occurred in the heat of passion"). Accordingly, the trial court did not err in denying Largen's proposed jury instructions.

E. *The evidence was sufficient to support Largen's convictions.*

Largen asserts that the evidence did not establish Largen's "intent at the time of entry" and that "the decedent's opening of the door nullified an inference of breaking and entering." He also submits that the evidence was insufficient to find him guilty of first-degree murder "because there was no evidence of premeditation." He posits that "the fact that the decedent drove away from the scene of the event and survived for 12 days afterward create[s] a reasonable hypothesis of lack of premeditation." Largen also challenges the sufficiency of all charges "because the circumstantial evidence did not eliminate the reasonable hypothesis of other causes of death or absence of malice." We disagree. We begin with Largen's specific challenges to his burglary conviction, then proceed to discuss his argument concerning premeditation, then we address his remaining argument regarding his hypothesis of innocence.

1. The evidence was sufficient to establish that Largen "broke" into C.M.'s apartment.

"To sustain the statutory burglary conviction the Commonwealth was required to prove that at the time [Largen] entered the apartment he intended to commit an assault and battery." *Jones v. Commonwealth*, 279 Va. 295, 299 (2010).[11] "In a prosecution for statutory burglary under Code § 18.2-91, proof that the accused unlawfully entered another's dwelling supports an inference that the entry was made for an unlawful purpose. The specific intent with which the unlawful entry is made may be inferred from the surrounding facts and circumstances." *Breeden v. Commonwealth*, 43 Va. App. 169, 181 (2004) (quoting *Robertson v. Commonwealth*, 31 Va. App. 814, 822 (2000)). "[A] breaking, either actual or constructive, to support a conviction

_____

[11] Code § 18.2-91 can be violated in numerous ways, but the jury in Largen's case was instructed that the Commonwealth had to prove "(1) [t]hat the defendant broke and entered the apartment of another; and (2) [t]hat he did so with the intent to commit an assault and battery."

of burglary, must have resulted in an entrance contrary to the will of the occupier of the house." *Davis v. Commonwealth*, 132 Va. 521, 523 (1922).

Here, the record does not support Largen's claim that C.M. opened the door for him such that Largen's entry into C.M.'s apartment was consensual. Although C.M. stated to police that "part of [her] door was open" when Largen was knocking on it and that she "open[ed] it" for Largen, she stated that she "pushed it back" and attempted to "shut it" and Largen "pushed it open." C.M. also described Largen's behavior as "raging." Law enforcement described "pieces of wood sticking out" around the doorknob of the front door to C.M.'s apartment. Officer King testified that C.M.'s apartment interior had "[s]tuff . . . laying kind of everywhere" and items that "looked out of place." Police also observed "the latch to the door . . . laying [on] the floor just inside the doorway." Lieteau described hearing "a lady screaming . . . 'stop, stop, stop,'" as well as "stomping and beating." He also said that the voice was "crying," "yelling," and "asking for help," negating Largen's assertion that C.M. let him into the residence or that his entry was consensual. C.M.'s statements to police in the parking lot that she briefly opened the door are not, standing alone, enough to overcome the other evidence in the record that demonstrated that C.M.'s front door had been broken. Accordingly, we hold that the evidence was sufficient to demonstrate that Largen broke into C.M.'s apartment with the intent to commit assault and battery.

2. <u>The evidence was sufficient to establish that Largen acted with premeditation.</u>

"To premeditate means to adopt a specific intent to kill, and that is what distinguishes first and second degree murder." *Avent v. Commonwealth*, 279 Va. 175, 208 (2010) (quoting *Remington v. Commonwealth*, 262 Va. 333, 352 (2001)). "When proof of premeditation is the subject of a sufficiency challenge, evidence showing that the premeditation was only slight or momentary is sufficient to sustain the conviction." *Jackson v. Commonwealth*, 267 Va. 178, 204

(2004). "Premeditation . . . seldom can be proved by direct evidence" and may be proven through circumstantial evidence. *Rhodes v. Commonwealth*, 238 Va. 480, 486 (1989). In determining whether premeditation existed, "the jury may properly consider the brutality of the attack, and whether more than one blow was struck, the disparity in size and strength between the defendant and the victim, the concealment of the victim's body, and the defendant's lack of remorse and efforts to avoid detection." *Avent*, 279 Va. at 208 (quoting *Epperly v. Commonwealth*, 224 Va. 214, 232 (1982)).

Here, there was sufficient evidence that a reasonable factfinder could rely on to conclude that Largen acted with premeditation. Dr. Goodman noted that C.M. had extensive injuries, including multiple contusions, areas of swelling, bruises, and hemorrhaging, as well as fractures of her eye sockets. C.M. also had blood in her chest cavity and bruising and bleeding "associated with her left lung." Dr. Goodman testified that the injuries were consistent with "more than one impact point" of injury—in "the multiples of tens"—and concluded that the cause of death was "blunt force trauma of the head, neck, torso, and extremities." C.M. was 68 years old at the time of her death, whereas Largen was 51 years old, and there was a vast size disparity between the two of them.

Furthermore, police observed that Largen's hair was wet and that he had recently attempted to clean some items of clothing with bleach. The jury was free to conclude that this was an attempt to conceal evidence of Largen's attack on C.M., evincing consciousness of guilt. *See Pearson v. Commonwealth*, 221 Va. 936, 946 (1981) (noting that appellant's "words and deeds following the crime are factors equally as important as his earlier conduct"). Based on the multiplicity of blows inflicted, the severity of C.M.'s injuries, the size disparity between Largen and C.M., and evidence of Largen's efforts to conceal that he was the perpetrator, the jury was entitled to infer that Largen had the specific intent to kill C.M.

- 28 -

3. <u>The evidence was sufficient to convict Largen, as the jury reasonably rejected Largen's hypothesis of innocence.</u>

"[T]he 'pertinent question' on appeal is 'whether a rational factfinder, in light of all the evidence, could have *rejected* [the defendant's] theories of innocence and found him guilty beyond a reasonable doubt.'" *Commonwealth v. Wilkerson*, 304 Va. 92, 102 (2025) (second alteration in original) (quoting *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017)). "If, based on the evidence presented, a jury *reasonably* rejects a proffered hypothesis of innocence, the hypothesis is not a reasonable one." *Cuffee v. Commonwealth*, ___ Va. ___, ___ (Apr. 16, 2026). "The hypotheses [of innocence] which must be thus excluded are those which flow from the evidence itself, and not from the imaginations of defense counsel." *Cook v. Commonwealth*, 226 Va. 427, 433 (1983). "If the evidence supports a reasonable hypothesis of innocence, then there exists a reasonable doubt as to the defendant's guilt, and the evidence cannot support a conviction." *Wilkerson*, 304 Va. at 102. "When examining an alternate hypothesis of innocence, the question is not whether 'some evidence' supports the hypothesis, but whether a rational factfinder could have found that the incriminating evidence renders the hypothesis of innocence unreasonable." *Williams v. Commonwealth*, 71 Va. App. 462, 485 (2020) (quoting *Vasquez v. Commonwealth*, 291 Va. 232, 250 (2016)). "What weight should be given evidence is a matter for the [factfinder] to decide." *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017) (alteration in original).

Here, the Commonwealth's evidence confirmed that Largen's physical assault on C.M. was the cause of her death. *See Commonwealth v. Jenkins*, 255 Va. 516, 521 (1998) ("An intervening event, even if a cause of the death, does not exempt the defendant from liability if that event was put into operation by the defendant's initial criminal acts."). Although Dr. Goodman did not deny that C.M.'s preexisting conditions may have made her ability to recover from her injuries more difficult, he confirmed that none of her conditions were

- 29 -

"independently fatal" and that they did not have an "impact" on his opinion regarding C.M.'s cause of death. *See Jenkins*, 255 Va. at 521 (holding that a doctor's testimony that a gunshot wound caused the victim's death by aspiration three days later "plainly support[ed] the jury's finding that [the victim] died as a result of the gunshot wounds inflicted by [appellant]"). He ultimately reaffirmed that the cause of C.M.'s death was "blunt force trauma of the head, neck, torso, and extremities." He concluded that the injuries "were due to blunt force trauma from the assault" and were not "naturally occurring." He reiterated that the cause of her medical complications and surgical interventions all stemmed from her original injuries when "she was assaulted in the first place." The mere passage of time or the fact that C.M. was able to cling to life with the help of extensive medical intervention does not negate the role that Largen played in initiating C.M.'s injuries and her subsequent death. Furthermore, as noted previously concerning Largen's proffered jury instructions, there was no evidence in the record that the killing occurred in the heat of passion or during mutual combat. Hence, the evidence was sufficient to prove the required causal connection between Largen's acts and the victim's death. Thence, there was sufficient evidence from which the jury was entitled to infer that Largen killed C.M. with premeditation and malice. Accordingly, the evidence was sufficient to support Largen's convictions.

## III. Conclusion

The trial court did not err in denying Largen's motions to strike Jurors P and S for cause, because both jurors indicated that they would have been impartial in their jury service and followed all the trial court's instructions. The trial court also did not err in admitting C.M.'s statements to police, as the circumstances surrounding her statements demonstrated that at the time she spoke to law enforcement, she made "spontaneous or impulsive" statements while still experiencing the effect of the injuries that would ultimately claim her life. Furthermore, the trial

- 30 -

court did not err in denying Largen's request to instruct the jury regarding manslaughter, because the evidence of Largen's blood at the scene—standing alone—was insufficient to rise to a "scintilla of evidence" supporting theories of heat of passion or mutual combat.  Finally, the trial court did not err because the evidence was sufficient to convict Largen of statutory burglary and murder.  For the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*